TOWN OF MIDLAND, Plaintiff v. HARRY T. MORRIS AND MARALYN R. MORRIS, Defendants

AND

TOWN OF MIDLAND, Plaintiff v. JOHN S[.] WAGNER AND ANNE D. WAGNER, Defendants

AND

TOWN OF MIDLAND, Plaintiff v. BEVERLY F. CHAPMAN, Defendant

AND

TOWN OF MIDLAND, Plaintiff v. BRENDA SEAFORD, HAROLD GRAY SEAFORD & BEN F. FISHER, Defendants

AND

TOWN OF MIDLAND, Plaintiff v. JIMMY RAY WILKINSON AND GILDA S[.] WILKINSON, Defendants

AND

TOWN OF MIDLAND, Plaintiff v. VAUDREY MESIMER AND EDITH MESIMER, Defendants

AND

TOWN OF MIDLAND, Plaintiff v. DOROTHY DRESCHER BLACK, Defendant

AND

TOWN OF MIDLAND, Plaintiff v. MARLENE T.[ ] COOK AND JENNINGS R. COOK, Defendants

AND

TOWN OF MIDLAND, Plaintiff v. ALBERTINE L. SMITH, Defendant

AND

TOWN OF MIDLAND, Plaintiff v. WILMER MELTON, JR. AND HARRIET L. MELTON, Defendants

AND

TOWN OF MIDLAND, Plaintiff v. WILMER MELTON, JR. AND HARRIET L. MELTON, Defendants

AND

TOWN OF MIDLAND, Plaintiff v. BILLY JAMES, NORRIS JAMES AND AMELIA GOODNIGHT, Defendants

AND

TOWN OF MIDLAND, Plaintiff v. CONCORD POLICE CLUB, INC., Defendant

AND

**TOWN OF MIDLAND v. MORRIS**

[209 N.C. App. 208 (2011)]

TOWN OF MIDLAND, Plaintiff v. THERON KEITH HONEYCUTT AND ANN NASH HONEYCUTT, Defendants

AND

TOWN OF MIDLAND, Plaintiff v. THERON KEITH HONEYCUTT AND ANN NASH HONEYCUTT, Defendants

AND

HARRY T.[ ] MORRIS AND MARALYN R. MORRIS, Plaintiffs v. TOWN OF MIDLAND, Defendant

AND

JIMMY RAY WILKINSON AND GILDA S. WILKINSON, Plaintiffs v. TOWN OF MIDLAND, Defendant

AND

VAUDREY MESI[M]ER AND EDITH MESI[M]ER, Plaintiffs v. TOWN OF MIDLAND, Defendant

AND

MARLENE T. COOK AND JENNINGS R. COOK, Plaintiffs v. TOWN OF MIDLAND, Defendant

AND

ALBERTINE L. SMITH, Trustee, Plaintiff v. TOWN OF MIDLAND, Defendant

AND

BILLY JAMES, NORRIS JAMES AND AMELIA GOODNIGHT, Plaintiffs v. TOWN OF MIDLAND, Defendant

AND

DOROTHY DRESCHER BLACK, Plaintiff v. TOWN OF MIDLAND, Defendant

AND

CONCORD POLICE CLUB, INC., Plaintiff v. TOWN OF MIDLAND, Defendant

No. COA10-322

(Filed 18 January 2011)

## 1. Appeal and Error— appealability—mootness—eminent domain

The property owners' appeal in an eminent domain case was not moot even though construction of the pertinent pipeline on their property was complete. If the Court of Appeals found in their favor, property owners would be entitled to relief both in the form of reimbursement for their costs in the action, as well as in the form of return of title to the land.

**2 . Evidence— judicial notice—Utilities Commission order— public documents**

Plaintiff town's motion to take judicial notice of a Utilities Commission order allowing joint motion for approval of settlement and abandonment of service was granted because it was an important public document. However, its motion to take judicial notice of actions of Piedmont Natural Gas, Monroe, and Mooresville were declined.

**3. Eminent Domain— condemnation—creation of gas transmission and distribution system—public use test—public benefit test—standing**

The trial court did not err by granting summary judgment in favor of plaintiff town based on its conclusion that the town lawfully exercised its eminent domain power. The town may acquire property by condemnation to establish a gas transmission and distribution system, even in the absence of a concrete, immediate plan to furnish gas service to its citizens. The condemnation passed the public use and public benefit tests. Property owners did not have standing to assert N.C.G.S. § 153-15 as a defense to the condemnations. Further, the Cabarrus County Voluntary Agriculture District did not bar the town's exercise of its condemnation power. Finally, condemnor was not required to specifically state each and every intended use of the property.

Appeal by Property Owners[1] from order entered 13 November 2009 by Judge Lindsay R. Davis, Jr. in Cabarrus County Superior Court. Heard in the Court of Appeals 16 September 2010.

*Styers & Kemerait, PLLC, by M. Gray Styers, Jr., and Hartsell & Williams, P.A., by Fletcher Hartsell and Michael Burgner, for Midland-Appellee.*

*Hamilton Moon Stephens Steele & Martin, PLLC, by Keith J. Merritt and Rebecca K. Cheney, for all Property Owner-Appellants except Property Owner-Appellant Wagner.*

*Ferguson, Scarbrough, Hayes, Hawkins, & DeMay, P.A., by James E. Scarbrough, for Property Owner-Appellant Wagner.*

STEPHENS, Judge.

---

1. This Court granted motions to dismiss the appeal in the actions numbered 08 CVS 4738, 09 CVS 525, 08 CVS 4070, 09 CVS 1978, and 09 CVS 1979. Further, 08 CVS 4069 was dismissed by this Court following a motion to withdraw appeal filed in that action.

## Facts

The Transcontinental Pipeline transports and distributes natural gas from the Gulf of Mexico to the northeastern United States. In April 2002, the City of Monroe, North Carolina, decided to supply the citizens of Monroe and the surrounding area with natural gas by a direct connection between its natural gas distribution system and the Transcontinental Pipeline. To directly connect to the Transcontinental Pipeline, Monroe needed to acquire the rights to property through which to run a pipeline along the forty-two miles between Monroe and the direct connection on the Transcontinental Pipeline located in Iredell County.

To facilitate the acquisition of land for the construction of the new pipeline ("Pipeline"), Monroe, located in Union County, entered into interlocal agreements with the Town of Mooresville, located in Iredell County, and the Town of Midland, located in Cabarrus County.

The relevant terms of the interlocal agreement between Midland and Monroe ("Interlocal Agreement") provide as follows:

4.  Midland shall be responsible for obtaining either by acquisition or by the power of eminent domain and holding in its name for the benefit of the parties and this Interlocal Agreement all easements (both permanent and temporary construction), rights of way, and real property required for the project in Cabarrus County.

. . . .

10.  . . . Midland shall grant Monroe a perpetual, non-exclusive right to use easements acquired pursuant to this agreement in Cabarrus County for continued location and operation of a natural gas pipeline and other public utilities so long as said utilities do not conflict with any Midland public utilities.

. . . .

20.  . . . Midland shall retain a perpetual right to locate and install one (1) tap in the pipeline within the corporate limits of Midland from which to operate and supply its own natural gas distribution utility for the benefit of Midland's utility customers in Cabarrus County only. The one tap for Midland's use shall be subject to a right of first refusal granted to a private natural gas provider to serve customers that would otherwise be served by Midland . . . .

21. During the term of this Agreement, Midland is hereby granted a maximum daily quantity of up to 5,000 decatherms per day capacity from the pipeline without demand or transportation fees, and Monroe shall retain the remaining capacity available for its own use.

. . . .

26. . . . Upon termination of this Agreement, it is understood and expressly agree[d] that Monroe shall retain a non-exclusive, perpetual easement over and across any easements or right of way acquired in Cabarrus County pursuant to this agreement and on which is located the pipeline which is the subject matter of this Agreement.

Midland, Monroe, and Mooresville also entered into a Joint Venture Agreement with Public Service Company of North Carolina ("PSNC"). The relevant portions of this agreement provide as follows:

A. Rights-of-Way.

. . . .

5. Midland and Mooresville each hereby agree to execute and deliver to PSNC prior to the Closing an Assignment . . . assigning to PSNC a non-exclusive right, title, and interest in and to all easements for the [Pipeline].

. . . .

B. Tap Rights.

1. Midland. Pursuant to the second amendment to the Interlocal Agreement between Midland and Monroe, Midland shall have the right to locate and install one (1) service tap from the Pipeline to serve customers located within the corporate limits of Midland as of December 4, 2008; provided that PSNC has first elected not to serve each such customer pursuant to its North Carolina Utilities Commission approved rate schedules and service regulations.

In 2008 Midland began the process of acquiring the property necessary for the construction of the Pipeline. When negotiations for voluntary acquisitions for the rights of way failed, Midland exercised its eminent domain authority to condemn the needed property.

The present controversy stems from fifteen condemnation actions filed by the Town of Midland in Cabarrus County Superior Court. In those fifteen actions, the opposing parties (hereinafter

"Property Owners") filed defenses and counterclaims, challenging Midland's power to condemn the properties in question; several Property Owners also filed separate claims against Midland for injunctive relief.

The many actions were consolidated for purposes of hearing dispositive motions involving the ability of Midland to condemn the properties. In each case, the dispositive motions were identified as motions for preliminary injunction, motions to dismiss, motions for summary judgment, or motions for a determination of all issues other than damages pursuant to N.C. Gen. Stat. § 40A-47. In the Superior Court of Cabarrus County, the Honorable Lindsay R. Davis presiding, the trial court ruled in favor of Midland, finding that Midland had the right to condemn the property, denying the Property Owners' motions for injunctive relief and motions to dismiss, and entering summary judgment in favor of Midland in the actions. From the trial court's order granting summary judgment for Midland, the Property Owners appeal.

## Discussion

### I. Mootness and Appellate Review

[1] Midland argues that Property Owners' appeal is moot because construction of the Pipeline is complete. In support of this argument, Midland cites this Court's decision in *Total Renal Care of North Carolina LLC v. North Carolina Dept. of Health and Human Servs. Div. of Health Serv. Regulation, Certificate of Need Section*, 195 N.C. App. 378, 673 S.E.2d 137 (2009). In our decision in *Total Renal Care*, which was based on a certificate of need statute that is entirely inapplicable to this case (and that has since been amended), this Court held that because the statute afforded the plaintiff no relief, even if the Court were to find in its favor, the appeal was moot.[2]

In this case, however, if this Court finds in their favor, Property Owners will be entitled to relief both in the form of reimbursement for their costs in the action, as well as in the form of return of title to

---

2. In *Total Renal Care*, petitioner appealed the decision by the Department of Health and Human Services ("DHHS") to issue a certificate of need ("CON") to respondent healthcare provider and respondent-intervenor developer. 195 N.C. App. 378, 673 S.E.2d 137. While the appeal was pending, respondent-intervenor developer completed, and respondent healthcare provider began operating, the kidney disease treatment center. *Id.* On appeal, this Court found that the appeal was moot because, pursuant to the statute governing withdrawal of a CON, DHHS was not authorized to withdraw a CON after the project or facility for which the CON was issued was completed and became operational. *Id.*

the land. *See* N.C. Gen. Stat. § 40A-8(b) (2009) (stating that if final judgment is that the condemnor is not authorized to condemn the property, the court with jurisdiction over the action shall award each owner of the property a sum that will reimburse the owner for his costs in defending the action); *see also* N.C. Gen. Stat. § 40A-1 (2009) (stating that "it is the intent of the General Assembly that . . . the uses set out in G.S. 40A-3 are the exclusive uses for which the authority to exercise the power of eminent domain is granted"); *see, e.g., State Highway Comm'n v. Thornton,* 271 N.C. 227, 241, 156 S.E.2d 248, 259 (1967) (holding that "[i]t is clear that private property can be taken by exercise of the power of eminent domain only where the taking is for a public use" and that "[t]o take [one's] property without his consent for a non-public use, even though he be paid its full value, is a violation of Article I, § 17, of the Constitution of [North Carolina] and of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States"). We are wholly unpersuaded by Midland's argument that, even where a city flagrantly violates the statutes governing eminent domain, that city can obtain permanent title to the land by fulfilling the purpose of a condemnation before final judgment on the validity of condemnation is rendered. Accordingly, we hold that this appeal is not moot and we address the merits of Property Owners' appeal.

## II. Judicial Notice

[2] Midland has asked this court to take judicial notice of (1) actions of Piedmont Natural Gas, Monroe, and Mooresville regarding the cessation of certain gas service to Monroe and Mooresville and those two cities' alleged natural gas needs, and (2) an Order by the North Carolina Utilities Commission ("Utilities Commission") approving a modification of the Joint Venture Agreement.

Regarding the Order of the Utilities Commission, our Supreme Court has stated that important public documents such as an order of the Utilities Commission will be judicially noticed. *State ex rel. Utils. Comm'n v. Southern Bell Tel. & Tel. Co.,* 289 N.C. 286, 288, 221 S.E.2d 322, 323-24 (1976); *see also State ex rel. Comm'r of Ins. v. North Carolina Auto. Rate Admin. Office,* 293 N.C. 365, 381, 239 S.E.2d 48, 58 (1977) (taking judicial notice of the North Carolina Rate Bureau's filing with the Commissioner of Insurance). Accordingly, we grant Midland's motion to take judicial notice of the Utilities Commission's Order Allowing Joint Motion for Approval of Settlement and Abandonment of Service, North Carolina Utilities Commission, Docket Nos. G-5, Sub 508, G-23, Sub 2, G-5, Sub 510, issued 18 May 2010.

As for Midland's motion to take judicial notice of actions of Piedmont Natural Gas, Monroe and Mooresville, we decline this invitation as the "uncontested facts" offered by Midland are irrelevant in our determination of the issues of this case. The fact that Monroe and Mooresville may soon have a need for the natural gas flowing through the Pipeline has no effect on the validity of Midland's condemnations. If this case is decided in Property Owners' favor, they will be entitled to relief regardless of the natural gas needs of Monroe and Mooresville.

### III. Validity of the Midland Condemnations

[3] On appeal, Property Owners argue that Midland's condemnations violated the applicable statutes such that the trial court's grant of summary judgment was error. As our Supreme Court has previously held, a *de novo* standard of review is appropriate for reviewing decisions on all issues other than damages in an eminent domain case. *Piedmont Triad Airport Auth. v. Urbine*, 354 N.C. 336, 338, 554 S.E.2d 331, 332 (2001), *cert. denied*, 535 U.S. 971, 152 L. Ed. 2d 381 (2002). Specifically, Property Owners raise several arguments challenging the right of Midland to acquire the property by exercise of its eminent domain power. We address each of these arguments separately below.

### A. Midland's lack of a plan to furnish gas services

Property Owners first argue that because Midland neither currently provides natural gas services to its citizens, nor currently has any plans to provide natural gas to its citizens in the future, the condemnations were undertaken in violation of the statutes governing eminent domain. We disagree.

Under N.C. Gen. Stat. § 160A-240.1, a city may, by any method including condemnation, acquire any property "for use by the city." N.C. Gen. Stat. § 160A-240.1 (2009). This use by the city must be an authorized use. *See Porsh Builders, Inc. v. City of Winston Salem*, 302 N.C. 550, 276 S.E.2d 443 (1981) (holding that a city may only exercise those powers granted by statute or charter). As applicable in this case, N.C. Gen. Stat. § 160A-312 authorizes a city to establish a public enterprise—including a gas transmission and distribution system—to "furnish services to the city and its citizens." N.C. Gen. Stat. §§ 160A-311(4), 160A-312(a) (2009). Further, a city may establish such an enterprise outside its corporate limits within reasonable limitations. N.C. Gen. Stat. § 160A-312.

In this case, Midland is acquiring through condemnation property located in Cabarrus County, but beyond the Midland corporate limits, to establish a gas transmission and distribution system, *i.e.*, the Pipeline. Under the terms of the Interlocal Agreement, Midland controls a tap on the Pipeline and is entitled to 5000 decatherms of natural gas per day at a discounted cost.

Property Owners argue that, regardless of Midland's entitlement to discounted natural gas and a tap on the Pipeline, Midland's lack of plans to ever furnish gas services to the city and its citizens shows that Midland is not condemning the property for any actual use by the city and that the condemnations are therefore unlawful. Midland counters that the mere potential to distribute low-cost natural gas to its citizens constitutes sufficient "use" by the city. Accordingly, the determinative issue is whether something more than mere availability or potential is required by the statutes.

Our resolution of this issue necessarily hinges on the breadth of our interpretation of section 160A-312: a narrow reading limits a city's power to establish a public utility to only those situations where the city has a concrete plan to furnish services; a broad reading grants a city power to establish a public utility where the city has a plan to develop the infrastructure and capability, but no immediate plan to actually furnish the services. Based on the following excerpt from N.C. Gen. Stat. § 160A-4, we must conclude that a broad interpretation of section 160A-312 is required:

> It is the policy of the General Assembly that the cities of this State should have adequate authority to execute the powers, duties, privileges, and immunities conferred upon them by law. To this end, the provisions of [Chapter 160A] and of city charters *shall be broadly construed* . . . .

N.C. Gen. Stat. § 160A-4 (2009) (emphasis added).

Furthermore, this Court has previously interpreted section 160A-312 to grant cities extensive power to establish and operate public enterprises:

> By the broad language the Legislature has used in G.S. § 160A-312 . . . it has evidenced its intent to give cities []comprehensive authority to own and operate public enterprises outside their boundaries with respect to the service of themselves and their citizens. We have construed the broad language of G.S. § 160A-312 as granting a city the absolute authority, without limitation or

restriction, to establish and conduct a public enterprise for itself and its citizens.

*Davidson County v. City of High Point*, 85 N.C. App. 26, 41, 354 S.E.2d 280, 288 (1987) (citations omitted), *modified and aff'd*, 321 N.C. 252, 362 S.E.2d 553 (1987).

Consistent with the broad mandates of sections 160A-4 and 160A-312, we find it manifest that Midland may acquire property by condemnation to establish a gas transmission and distribution system, even in the absence of a concrete, immediate plan to furnish gas services to its citizens.

While we acknowledge the existence of the requirement that the public enterprise be established and conducted for the city and its citizens, we conclude that this requirement is satisfied by Midland's placement of a tap on the Pipeline and by Midland's acquisition of the right to low-cost natural gas. Further, although one spokesman for Midland professes a lack of any current plan to offer gas to its citizens, there is nothing in the record to indicate that Midland will never offer natural gas services to its citizens. In fact, Midland's contracted-for right to install a tap on the Pipeline "from which to operate and supply its own natural gas distribution utility for the benefit of Midland's utility customers" indicates just the opposite: that Midland will, eventually, furnish natural gas services to its citizens.[3]

Based on the foregoing, we conclude that Midland's acquisition by condemnation of the property for the Pipeline is for use by the city such that section 160A-240.1 is satisfied. Property Owners' argument is overruled.

### B. No public use or benefit

Property Owners further argue that Midland's condemnations violate N.C. Gen. Stat. § 40A-3(b) because the condemnations are not "for the public use or benefit."

As discussed *supra*, under section 160A-240.1, a city may acquire real property for use by the city by any lawful method, including

---

3. Property Owners also argue that Midland itself will never furnish services based on PSNC's right of first refusal to serve any Midland customers. However, as section 160A-312 authorizes a city to establish, as well as contract for the operation of, public enterprises, that PSNC may ultimately provide the service from Midland's tap does not negate the fact that Midland's condemnations are for the purpose of furnishing the citizens of Midland with natural gas services. As for the effect of this right of first refusal on the issue of whether these condemnations are for a public or private purpose, see Discussion section III, C, *infra*.

condemnation. N.C. Gen. Stat. § 160A-240.1. However, "[i]n exercising the power of eminent domain a city shall use the procedures of Chapter 40A." *Id.*

N.C. Gen. Stat. § 40A-3, which governs the exercise of the eminent domain power by a municipality, provides as follows:

> For the public use or benefit, the governing body of each municipality or county shall possess the power of eminent domain and may acquire by purchase, gift or condemnation any property, either inside or outside its boundaries, for the following purposes.
>
> . . . .
>
> (2) Establishing, extending, enlarging, or improving any of the public enterprises listed in G.S. 160A-311 for cities . . . .

N.C. Gen. Stat. § 40A-3(b) (2009). The list of public enterprises in section 160A-311 includes gas transmission and distribution systems. N.C. Gen. Stat. § 160A-311(4).

It is clear from the statutory language that establishing a gas transmission and distribution system is an appropriate purpose for the condemnation of property under section 40A-3(b). N.C. Gen. Stat. § 40A-3(b); *see also Transcontinental Gas Pipe Line Corp. v. Calco Enters.*, 132 N.C. App. 237, 511 S.E.2d 671, *disc. review denied and appeal dismissed*, 351 N.C. 121, 540 S.E.2d 751 (1999). Accordingly, the issue under section 40A-3(b) is whether Midland's condemnations are "[f]or the public use or benefit."

Despite the disjunctive language of this statutory requirement, our Courts have determined the propriety of a condemnation under section 40A-3 based on the condemnation's satisfaction of both a "public use test" and a "public benefit test." *See Carolina Tel. & Tel. Co. v. McLeod*, 321 N.C. 426, 430, 364 S.E.2d 399, 401 (1988); *Stout v. City of Durham*, 121 N.C. App. 716, 718, 468 S.E.2d 254, 257, *review allowed*, 344 N.C. 637, 477 S.E.2d 54 (1996), *review withdrawn*, 345 N.C. 353, 484 S.E.2d 93 (1997).

> The first approach—the public use test—asks whether the public has a right to a definite use of the condemned property. The second approach—the public benefit test—asks whether some benefit accrues to the public as a result of the desired condemnation.

*Carolina Tel. & Tel. Co.*, 321 N.C. at 430, 364 S.E.2d at 401.

Under the public use test, "the principal and dispositive determination is whether the general public has a right to a definite use of the property sought to be condemned." *Id.* This test is applied by our Courts in the context of whether the general public, as opposed to a small group of persons or a single person or entity, has the right to use the property. *See id.; Thornton,* 271 N.C. 227, 156 S.E.2d 248; *City of Charlotte v. Heath,* 226 N.C. 750, 40 S.E.2d 600 (1946); *Stout,* 121 N.C. App. at 718, 468 S.E.2d at 257. Applying this test to the present case in the appropriate context, there is nothing to indicate that gas services—were they to be provided by Midland—would be available to anything less than the entire population. Accordingly, there can be no doubt that the Midland condemnations would pass the public use test because the right to use is granted "in common, not to particular individuals or estates." *Carolina Tel. & Tel. Co.,* 321 N.C. at 430, 364 S.E.2d at 401 (quoting *Heath,* 226 N.C. at 756, 40 S.E.2d at 605).

However, Property Owners argue that the public use test should be applied in this case to prohibit the Midland condemnations because the citizens of Midland have no right to a definite use of the Pipeline based on the fact that "Midland may never tap into the [P]ipeline." We are not persuaded by Property Owners' argument. As noted *supra,* Property Owners' assertion that Midland may never tap into the pipeline—supported by the Mayor of Midland's affidavit professing to have no plans to furnish gas service to Midland—is belied by the fact that Midland contracted for control of a tap capable of servicing the citizens of Midland. Although the Midland citizens' right to a definite use of the Pipeline is contingent upon Midland offering the services, that right is not barred by the fact that the current municipal administration has no plans to furnish services; the *probability* of the exercise of the right to use should not be conflated with the *inability* to exercise that right. Accordingly, we conclude that the citizens of Midland do have a right to a definite use of the Pipeline such that the condemnations satisfy the public use test.

Under the public benefit test, "a given condemnor's desired use of the condemned property in question is for 'the public use or benefit' if that use would contribute to the general welfare and prosperity of the public at large." *Carolina Tel. & Tel. Co.,* 321 N.C. at 432, 364 S.E.2d at 402. In this case, we must take care in defining Midland's "desired use" of the property. Midland is condemning the property to run the Pipeline and to control a tap on the Pipeline, not to immediately provide gas to the citizens of Midland. Accordingly, it is the *availability*

of natural gas that must contribute to the general welfare and prosperity of the public at large.

As noted by our Courts, the construction and extension of public utilities, and especially the concomitant commercial and residential growth, provide a clear public benefit to local citizens. *See State ex rel. Utils. Comm'n v. Carolina Util. Customers Ass'n*, 337 N.C. 236, 239-41, 446 S.E.2d 348, 350-51 (1994) (upholding the Utilities Commission's findings that "[t]he availability of natural gas service is an important factor in industrial recruitment" and that expansion of natural gas facilities into unserved areas "will assist in the economic development of unserved areas"); *Stout*, 121 N.C. App. at 719, 468 S.E.2d at 257 (noting that "the paramount public interest served by construction of the [utility] is the continued residential and commercial growth which it enables"). Likewise, in this case, Midland's tap on the Pipeline, and its potential to provide natural gas service, likely will spur growth, as well as provide Midland with an advantage in industrial recruitment. These opportunities must be seen as public benefits accruing to the citizens of Midland, such that Midland's condemnations are for the public benefit.

Further, as noted by Midland, N.C. Gen. Stat. § 62-2 makes the following declaration with respect to this issue:

> (a) Upon investigation, it has been determined that the rates, services and operations of public utilities as defined herein, are affected with the public interest and that the availability of an adequate and reliable supply of electric power and natural gas to the people, economy and government of North Carolina is a matter of public policy. It is hereby declared to be the policy of the State of North Carolina:
>
> . . . .
>
> (9) To facilitate the construction of facilities in and the extension of natural gas service to unserved areas in order to promote the public welfare throughout the State
>
> . . . .

N.C. Gen. Stat. § 62-2(a)(9) (2009).

The clear language of the statute indicates that, as a matter of North Carolina policy, *facilitation* of the extension of natural gas service to unserved areas—and not simply the extension itself—promotes the public welfare. *Id.* A tap on the Pipeline that is

controlled by Midland facilitates extension of natural gas service to the unserved citizens of Midland.

Based on the foregoing, we conclude that the condemnations by Midland were for the public benefit or use such that the condemnations do not violate section 40A-3(b). Accordingly, Property Owners' argument is overruled.

## C. Condemnations are for a private purpose

Property Owners next argue that because Midland has agreed to assign to PSNC "a non-exclusive right, title and interest in and to" all Pipeline easements, and because, pursuant to the Joint Venture Agreement, PSNC is a 25% owner of the Pipeline, the condemnations are for a private purpose and, consequently, they are unlawful under North Carolina law.

Regarding this issue, Midland has asked this Court to take judicial notice of an amendment to the Joint Venture Agreement. As discussed *supra*, because this amendment has been memorialized in an order of the Utilities Commission, we will take judicial notice of the amendment.

As noted in the Utilities Commission report, the amendment to the Joint Venture agreement will "eliminate PSNC's ownership interest in the [] Pipeline" and will "provide that the [P]ipeline will be a purely municipal enterprise[.]" Accordingly, Property Owners' argument with respect to PSNC's ownership is overruled.

As for Property Owners' argument that PSNC's easement rights make the condemnations solely for a private purpose, this Court has held that where the taking benefits both public and private interests, the controlling question is "whether the paramount reason for the taking of land to which objection is made is the public interest, to which benefits to private interests are merely incidental, or whether, on the other hand, the private interests are paramount and controlling and the public interests merely incidental." *Stout*, 121 N.C. App. at 719, 468 S.E.2d at 257 (quoting *Carolina Tel. & Tel. Co.*, 321 N.C. at 434, 364 S.E.2d at 403).

Applying this test in *Stout*, we held that condemning property to extend a sewer system to accommodate a private developer of a shopping mall was in the public, rather than private, interest because "[t]hough [the private] development may have hastened the need for expanded sewer services in the vicinity, the paramount public interest

served by construction of the [sewer] outfall is the continued residential and commercial growth which it enables." 121 N.C. App. at 719, 468 S.E.2d at 257. Similarly, in *Carolina Tel. & Tel. Co.*, a case in which plaintiff telephone company was condemning the property to provide service to only one customer, our Supreme Court upheld the plaintiff telephone company's condemnation, noting that the provision of telephone service to one customer was "a small part of a more important and more far-reaching effort—the effort to ensure that, in an era in which the telephone has truly become a necessity, whole communities, as well as members of individual communities, are interconnected by telephone systems." 321 N.C. at 433, 364 S.E.2d at 403.

Unlike in the cases above, where the condemnation was initially undertaken to accommodate one private party—a private shopping center developer and a private landowner—but where the corresponding public benefits clearly overshadowed that private benefit, in this case the condemnations were undertaken to facilitate the extension of natural gas services to all of the citizens of Midland, and there is nothing to indicate that the condemnations were undertaken solely to accommodate PSNC's efforts to serve its current or future customers. Furthermore, as discussed *supra*, this extension of services to Midland's citizens carries with it the corresponding public benefits of growth and industrial recruitment. The fact that PSNC, along with Monroe, is granted an easement on the Pipeline cannot overshadow the public benefits accruing to the citizens of Midland. Accordingly, PSNC's "non-exclusive right, title, and interest in and to all easements" for the Pipeline in Cabarrus County must be seen as incidental to the paramount public interest served by the establishment of a gas transmission and distribution system.

We further note that the existence of PSNC's right of first refusal to serve Midland citizens does not affect our conclusion that the condemnation is lawful. Firstly, section 160A-312(a) grants Midland the authority to "contract for the operation of any or all of the public enterprises[.]" N.C. Gen. Stat. § 160A-312(a). As such, Midland is not required to operate the gas distribution system itself, and may lawfully contract with PSNC to provide services to its citizens. Secondly, Midland's control of the tap on the Pipeline will allow Midland to provide natural gas services to its citizens regardless of whether PSNC exercises its right of first refusal, effectively guaranteeing that natural gas service will be available to the citizens of Midland.

Accordingly, we conclude that the Midland condemnations were not undertaken to provide a solely private benefit.

### D. Violation of N.C. Gen. Stat. § 153A-15

Property Owners further argue that the condemnations either violate, or are a sham to avoid, N.C. Gen. Stat. § 153A-15 and are therefore unlawful.

Section 153A-15 provides, *inter alia*, that a city seeking to acquire—whether by condemnation, exchange, purchase, or lease—property located in a county other than the county in which the city is located must obtain the consent or approval of the board of commissioners of the county where the land is located. N.C. Gen. Stat. § 153A-15 (2009). As violations of section 153A-15, Property Owners assert (1) that Midland is just a "token title-holder" and Monroe is the actual condemnor and therefore Monroe is acquiring property located in Cabarrus County without the consent of the Cabarrus County Board of Commissioners, and (2) that, by operation of the Interlocal Agreement, Monroe is acquiring real property located in Cabarrus County without the approval of the Cabarrus County Board of Commissioners.

Before we address the merits of Property Owners' contention, however, we must decide whether Property Owners have standing to assert section 153A-15 as a defense to Midland's condemnations. Although neither party raised the issue of standing with respect to this argument, we note that "standing is a jurisdictional issue and this Court may raise the question of subject matter jurisdiction on its own motion." *See Union Grove Milling & Mfg. Co. v. Faw*, 109 N.C. App. 248, 251, 426 S.E.2d 476, 478, *aff'd per curiam*, 335 N.C. 165, 436 S.E.2d 13 (1993) (quoting *Reliance Ins. Co. v. Walker*, 33 N.C. App. 15, 234 S.E.2d 206, *disc. review denied*, 293 N.C. 159, 236 S.E.2d 704 (1977)); *see also Hedgepeth v. N.C. Div. of Servs. for the Blind*, 142 N.C. App. 338, 341, 543 S.E.2d 169, 171 (2001) ("[I]ssues pertaining to standing may be raised for the first time on appeal, including *sua sponte* by the Court.").

Rule 17(a) of the North Carolina Rules of Civil Procedure provides that every claim shall be prosecuted in the name of the real party in interest. N.C. Gen. Stat. § 1A-1, Rule 17 (2009). "This Court has previously stated that the real party in interest is the party who by substantive law has the legal right to enforce the claim in question." *Union Grove Milling*, 109 N.C. App. 248, 251, 426 S.E.2d 476, 479 (internal quotation marks, bracket, and citation omitted).

In *County of Johnston v. City of Wilson*, 136 N.C. App. 775, 525 S.E.2d 826 (2000), this Court, interpreting section 153A-15, held that "the County, through its Board of Commissioners, was statutorily granted the *substantive right* to protect its citizens from unlawful takings by contiguous local governments. See N.C.G.S. § 153A-15." *Id.* at 779, 525 S.E.2d at 829 (emphasis added). The power to exercise this substantive right granted to a county is vested solely in the board of commissioners. *See* N.C. Gen. Stat. § 153A-12 (2009) ("Except as otherwise directed by law, each power, right, duty, function, privilege and immunity of the [county] shall be exercised by the board of commissioners."). Accordingly, the real party in interest who by substantive law has the legal right to enforce a claim arising under section 153A-15 is the county affected by a potential section 153A-15 violation and not an individual property owner.

Likewise, it is well settled that an appeal may only be taken by an *aggrieved* real party in interest. *State Farm Mut. Auto. Ins. Co. v. Ingram, Comm'r of Ins.*, 288 N.C. 381, 218 S.E.2d 364 (1975); *County of Johnston*, 136 N.C. App. 775, 525 S.E.2d 826. "[A] person aggrieved is one adversely affected in respect of legal rights, or suffering from an infringement or denial of legal rights." *County of Johnston*, 136 N.C. App. at 779, 525 S.E.2d at 829 (internal quotation marks omitted). Based on its interpretation of section 153A-15, this Court has previously held that a county has "standing to proceed as an aggrieved real party in interest" where a decision adversely affects that county's section 153A-15 rights. *Id.*

Although Property Owners clearly have standing to proceed with their appeal as aggrieved real parties in interest based on the adverse effect of the trial court's ruling on their property rights, it is not so clear that Property Owners are entitled to appeal the ruling based on its adverse effect on the rights granted to a board of county commissioners under section 153A-15; those rights conferring standing to Property Owners are not the same rights conferring standing to a board of county commissioners. Further, it is notable that in the only cases brought before this Court in which section 153A-15 rights are at issue, the party asserting those rights has been a county. *See Caswell County v. Town of Yanceyville*, 170 N.C. App. 124, 611 S.E.2d 451 (2005); *County of Johnston*, 136 N.C. App. 775, 525 S.E.2d 826.

" 'Standing typically refers to the question of whether a particular litigant is a proper party to assert a legal position. Standing carries with it the connotation that someone has a right; but, quaere, is the

party before the court the appropriate one to assert the right in question.' " *Higgins v. Simmons*, 324 N.C. 100, 103, 376 S.E.2d 449, 452 (1989) (quoting *State v. Labor and Indus. Review Comm'n*, 136 Wis. 2d 281, 287 n.2, 401 N.W.2d 585, 588 n.2 (1987)). In this case, because section 153A-15 grants substantive rights to an affected county, and not to an individual property owner, the appropriate party to assert the statutory rights granted by section 153A-15 must be an affected county, and not an individual property owner. *See id.* (holding that a party cannot assert a statute as a defense where the statute grants rights personal to other person and not to the party). Therefore, we conclude that Property Owners do not have standing to assert section 153A-15 as a defense to Midland's condemnations. As such, this Court does not have subject matter jurisdiction to hear the argument. *See Estate of Apple v. Commercial Courier Express, Inc.*, 168 N.C. App. 175, 177, 607 S.E.2d 14, 16 ("If a party does not have standing to bring a claim, a court has no subject matter jurisdiction to hear the claim."), *disc. review denied*, 359 N.C. 631, 613 S.E.2d 688 (2005). Accordingly, we must dismiss Property Owner's section 153A-15 argument.

*E. Failure to follow the procedures for condemnation of property in the Cabarrus County Voluntary Agricultural District*

Property Owners' argument on this issue affects only those properties owned by Property Owner Albertine L. Smith and Property Owners Vaudrey and Edith Mesimer, which properties are included in the Cabarrus County Voluntary Agricultural District ("VAD"). Property Owners argue that the relevant condemnation proceedings should be dismissed because Midland is attempting to condemn these properties in violation of the Cabarrus County VAD ordinance.

Under N.C. Gen. Stat. § 106-740, a VAD ordinance

> may *provide* that no State or local public agency or governmental unit may formally initiate any action to condemn any interest in qualifying farmland within a voluntary agricultural district under this Part . . . until such agency has requested the local agricultural advisory board established under G.S. 106-739 to hold a public hearing on the proposed condemnation.

N.C. Gen. Stat. § 106-740 (2009) (emphasis added).

The Cabarrus County VAD ordinance contains an "Article X Public Hearings," which deals with requests for proposed condemnations of property located in a VAD and which states as follows:

A. Purpose

> Pursuant to N.C.G.S. § 106-740, which provides that no state or local public agency or governmental unit may formally initiate any action to condemn any interest in qualifying farmland within a District until such agency or unit has requested the Advisory Board to hold a public hearing on the proposed condemnation.

Cabarrus County, NC, Voluntary Agric. Dist. Ordinance, art. X (enacted 2005).

Although section 106-740 permits a VAD ordinance to provide that no condemnation may be initiated until a request for hearing has been made, Article X of the Cabarrus County VAD ordinance has not so provided. The purpose section of Article X states that it is pursuant to section 106-740, which itself states that a VAD ordinance *may* provide for public hearings. However, the introductory clause that serves as the Cabarrus County VAD, Article X purpose "statement" does not actually "provide that no State or local public agency or governmental unit may formally initiate any action to condemn" property in the Cabarrus County VAD without first requesting a hearing. In the absence of language affirmatively exercising the power granted to the Cabarrus County VAD by section 106-740, we must conclude that the Cabarrus County VAD does not serve as a bar to Midland's exercise of its condemnation power. Accordingly, Property Owners' argument is overruled.

*F. Use of the condemned property is limited to use as a natural gas pipeline*

By their final argument, Property Owners contend that the purpose of the condemnations, as stated by Midland in its notices of condemnation, was "to construct and operate a natural gas pipeline for the transmission and distribution of natural gas serving the citizens of Midland and Cabarrus County as well as to construct and operate a fiber optic line[.]" Accordingly, Property Owners argue that the easements can only be used for the purposes set forth in the notice and no other purposes. Specifically, Property Owners contend that the easements may only be used to distribute natural gas to citizens of Cabarrus County and may not be used to serve residents outside the county. However, because this Court has previously held that while a condemnor must state the fundamental purpose of the condemnation in the notice, a condemnor "need not specifically state each and every

intended 'use' of the property" in the notice, *Catawba County v. Wyant*, 197 N.C. App. 533, 541, 677 S.E.2d 567, 572 (2009) (quoting *Scotland County v. Johnson*, 131 N.C. App. 765, 769, 509 S.E.2d 213, 215 (1998)), we conclude that the portion of the Pipeline running through the property condemned by Midland may be used to transport natural gas to other persons, as well as to citizens of Midland.

Property Owners further contend that Midland "appears to claim in both the [Interlocal Agreement] and in the Affidavit of [the Midland Mayor], that Midland can use the easements obtained for construction of a natural gas pipeline for any other utility purpose." Property Owners argue that the construction of any other utility would constitute an additional burden and would require additional compensation. As previously discussed, Midland is not required to state every use for the property, as long as the fundamental purpose of the condemnation is stated. *Id.* However, even if construction of another utility would not be included in the fundamental purpose of constructing the natural gas utility, the fact remains that Midland has properly exercised its power of eminent domain to acquire the property necessary to construct a gas pipeline. Because there is no evidence of any other utility construction by Midland before this Court, we must conclude that any ruling on the issue of additional compensation based on a hypothetical additional burden is premature.

We hold that Midland lawfully exercised its eminent domain power. Therefore, the ruling of the trial court granting summary judgment in favor of Midland is

AFFIRMED in part, DISMISSED in part.

Judges ELMORE and JACKSON concur.

Judge JACKSON concurred prior to 1 January 2011.